IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                   CRIMINAL ACTION NO. 2:14-cr-00094

GARY DALE SPURLOCK,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending is Defendant Gary Dale Spurlock's motion to suppress [ECF 26]. For the reasons that follow, the Court **DENIES** the motion.

I.    BACKGROUND

*A. Factual Background*

The following facts, unless otherwise noted in this opinion, are not in dispute and are derived from the evidence and proffers produced at Defendant's pre-trial motions hearing and in the parties' filings and the various exhibits attached thereto.

On December 5, 2013, J.W., Defendant's girlfriend, with whom he was then residing, filed a domestic violence petition against Defendant. (ECF 35-1 at 1, 3, 9.) In the petition, J.W. alleged that Defendant had threatened her, her daughter, and her son-in-law, that Defendant had tried to hold her captive in the bathroom, that Defendant had grabbed her by the hair to stop her from getting away, and that she had "been threaten[ed] with [g]uns." (*Id.* at 6.) Additionally, J.W. alleged, by checking a box on the pre-printed petition form, that "[f]irearm(s) [were]

involved" in the alleged domestic violence offense and that "[f]irearm(s) [were] present on [Defendant's] property or in [Defendant's] possession." (*Id.* at 1, 2.) She further indicated elsewhere on the form that Defendant currently owned or possessed firearms. (*Id.* at 6.)

J.W.'s petition requested that the Magistrate Court of Boone County issue an emergency protective order ("EPO"). (*Id.* at 7.) J.W. checked a box indicating that she gave her consent for any law enforcement officer to enter the residence she shared with Defendant for the purpose of enforcing the protective order that would issue. (*Id.*)

An EPO was issued that day. (ECF 35-2 at 7.) The EPO states on page three as follows: "According to W. Va. Codes § 48–27–403 and § 48–27–502(b), the Respondent shall not possess any firearms (even those for which the Respondent has a license to possess) or ammunition while this Protective Order is in effect, and you are hereby informed of this prohibition." (*Id.* at 3.) The order also cautions on three other pages in the ten-page document that it may be a state and federal criminal offense to possess any firearm or ammunition while the order is in effect. (*Id.* at 1, 8, 9.)

Additionally, the magistrate ordered, by way of initialing a provision on the pre-printed EPO, that

> [p]ursuant to the Rules of Practice and Procedure for Domestic Violence Civil Proceedings, Rule 10b and to enforce the provisions of W.Va. Code 48, Article 27 regarding firearms; it is hereby ORDERED to protect the physical safety of the Petitioner and other protected individuals herein that: Respondent shall surrender any and all firearms and ammunition possessed or owned by the Respondent to the law enforcement officer serving this Order.

(*Id.* at 4.) The magistrate also checked a box and initialed a line next to a provision on the pre-printed EPO stating that "Petitioner gives consent for any law enforcement officer to enter his or her separate residence or the household jointly owned by the parties and awarded herein to

Petitioner with or without a warrant to enforce the Emergency Protective Order as provided by W.Va. Code § 48–27–601." (*Id.*) Finally, the EPO awarded J.W. "temporary possession of the residence or household jointly resided in by the parties at the time the abuse occurred" and stated in bold type that "Respondent shall leave the premises immediately on receipt of this Order and shall not re-enter while this Order remains in effect." (*Id.*)

On December 9, 2013, J.W. and her brother visited the Boone County Sheriff's Department and spoke with Corporal Foster. (ECF 41 at 29.) The meeting was not pre-arranged, but rather took place at the request of another member of the Sheriff's Department when Corporal Foster happened to be in the office, as J.W. and her brother had some information they wanted to share with an officer. (*Id.*) At that time, Corporal Foster was not aware that J.W. had filed a domestic violence petition against Defendant and does not remember discussing the matter. (*Id.* at 27.) J.W.'s brother told Corporal Foster that he believed that he saw Defendant with a gun that had an illegal or scraped-off serial number about a year earlier. (*Id.* at 29.) Corporal Foster did not act on this information at the time, however, because he thought that a year was "a little long to try to get a search warrant for." (*Id.*)

Defendant was not served with the petition or the order until December 10, 2013, when he went voluntarily to the Sheriff's Department after hearing that a domestic violence petition had been filed against him. (*Id.* at 10, 16, 34.) There, Corporal Foster served Defendant with both the petition and the order. (*Id.* at 10; ECF 35-1 at 11; ECF 35-2 at 10.) Corporal Foster testified that he advised Defendant that this was a civil matter, not a criminal matter, and that Defendant was not in trouble. (ECF 41 at 12, 18.) Defendant, however, does not recall receiving any such advisement. (*Id.* at 35.) Nonetheless, the parties are in general agreement about what transpired during service of the petition and the order.

Corporal Foster read to Defendant the provision of the order directing him to surrender any firearms and ammunition that he possessed. (*Id.* at 17, 42.) Defendant did not read the terms of the order thoroughly, but he "scanned over it" and saw that it was a court order issued by a magistrate judge (*id.* at 42; *see also id.* at 35) and thought it said that he had to surrender his guns (*id.* at 38). Corporal Foster asked Defendant if he had any firearms in his home. (*Id.* at 17.) Defendant responded that he had several guns, and Corporal Foster told Defendant he had to surrender the guns to him. (*Id.* at 10, 11, 17, 41.) Corporal Foster testified that the Defendant was cooperative with everything he said and made no argument. (*Id.* at 19.) It was arranged that Defendant would leave in his own car and Corporal Foster and another officer,[1] in two separate cars, would follow Defendant back to Defendant's house, where the agents would retrieve Defendant's firearms. (*Id.* at 11, 20, 36.)

At Defendant's home, Corporal Foster testified that Defendant was polite and cooperative. (*Id.* 41 at 11–12.) Defendant led the officers to a walk-in closet in the master bedroom where he kept his guns in and around a gun safe. (*Id.* at 12, 22, 36.) After Defendant opened the safe, Defendant was told to step back from the safe. (*Id.* at 23, 36, 38, 43.) The officers removed the guns themselves. (*Id.* at 36.) Defendant was not allowed to handle any guns himself as a matter of officer safety. (*Id.* at 23.)

One of the guns recovered by the officers was a shotgun that appeared to have a short barrel. (*Id.* at 12.) Corporal Foster testified that he told Defendant that the shotgun appeared to be short and may be illegal, to which Defendant responded, "Maybe most of the guns I have are illegal." (*Id.* at 13; *see also id.* at 24.) Defendant testified that Corporal Foster said the gun would have to be measured to see if it was legal (*id.* at 38, 48), but Defendant said he did not

---

[1] Corporal Foster testified that one officer came with him. (ECF 41 at 11.) Defendant testified that two officers in addition to Corporal Foster came to his home. (*Id.* at 37.)

know what constitutes "too short" and denied having stated that most of his guns were probably illegal (*id.* at 48). Another one of the guns Defendant surrendered was observed to have a scraped-off serial number. (*Id.* at 31.) While executing the EPO, the officers recovered twenty-two guns in all. (ECF 40 at 26.)

Defendant was not placed in handcuffs or in a police car, nor was he arrested on that day. (ECF 41 at 42.) However, Defendant maintains that he believed he was not free to do anything but go to his home with the officers and follow the commands they gave him. (*Id.* at 4; *see also id.* at 35, 37, 39, 41.) On the other hand, Corporal Foster testified that in EPO gun surrender situations, if the accused person says he has no guns or does not give the officer permission to enter his home, that's the end of the story and the police would need to get a warrant. (*Id.* at 12, 16–17, 19–20, 22; *see also id.* at 7.)

Later in the day on December 10, 2013, Corporal Foster ran the serial numbers of all the firearms that Defendant had surrendered to him through the National Crime Information Center and learned that several of the guns had been reported stolen. (*Id.* at 22, 28; ECF 40 at 29.) Corporal Foster obtained a search warrant on December 11, 2013, to search the entire residence for additional guns since, when retrieving weapons pursuant to the EPO, he believed he could only go where Spurlock told him his guns were but could not do a search of Defendant's entire house. (ECF 41 at 21–22.) Corporal Foster recovered additional guns from Defendant's house. (*Id.* at 39.) Defendant, having learned that there was a warrant for his arrest, went to the Boone County Courthouse with his attorney, where Corporal Foster met him and escorted him across the street to the Boone County Sheriff's Department. (ECF 40 at 29–30.) There, Corporal Foster interviewed Defendant about the shotgun with the short barrel and the revolver with the obliterated serial number, among other firearms. (*Id.* at 30; ECF 41 at 32–33, 44–47.)

Based on the shotgun and revolver surrendered on December 10, 2013, Defendant was subsequently charged in a two-count indictment with (1) possession of a firearm as defined by 26 U.S.C. § 5845(a)(2), namely, a 12 gauge double barrel shotgun with an overall length of less than 26 inches and a barrel of less than 18 inches, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871; and (2) possession of a firearm with an obliterated serial number in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B).

### B. *Procedural Background*

On June 10, 2014, Defendant moved to suppress the two firearms cited in the indictment and statements made at the time of their surrender, alleging a Fourth Amendment violation. (ECF 26.) Shortly thereafter, Defendant filed a memorandum in support, in which he raised additional arguments under the Fifth Amendment. (ECF 30.) On June 23, 2014, the Court conducted an evidentiary hearing on Defendant's motion to suppress. After the Government filed its response (ECF 35), Defendant filed a reply, in which he further developed the arguments made in his earlier briefing (ECF 37). Thereafter, Defendant filed a supplemental memorandum in which he raised additional arguments regarding the reliability of Corporal Foster's testimony and provided additional authority and materials in support of his Fourth and Fifth Amendment arguments. Further, Defendant asserted for the first time that West Virginia law violates the Fourth Amendment to the extent that it permits the warrantless seizure of firearms pursuant to an emergency domestic violence protective order. (ECF 50.)

In light of Defendant's arguments, the Court entered a Notice and Certification of Constitutional Question certifying that Defendant's motion to suppress challenges the constitutionality of a form order that appears to be utilized in West Virginia's Magistrate Courts, and by extension potentially also challenges the constitutionality of certain West Virginia

statutes and rules of procedure. (ECF 55.) On September 4, 2014, the Attorney General of West Virginia, on behalf of the State of West Virginia ("State"), moved to intervene. (ECF 58.) The Court granted the motion (ECF 59), and on October 14, 2014, the Attorney General filed the State's response regarding the constitutionality of the challenged state protective order (ECF 62).

The motion is now amply briefed and ready for the Court's consideration.

## II.     DISCUSSION

Defendant seeks to suppress the above-described shotgun and revolver that he surrendered to Corporal Foster on December 10, 2013, pursuant to the EPO as well as the alleged incriminating statements he made in the presence of Corporal Foster regarding the possible illegality of his firearms and any other subsequent statements.

### A. *Fourth Amendment Warrant Requirement*

First, Defendant argues that the officers conducted a warrantless search of Defendant's home and safe, and seizure of the firearms therein, in violation of the Fourth Amendment. (ECF 30 at 6; ECF 37 at 2.) Defendant asks the Court to suppress both the two firearms cited in the indictment and statements made at the time of their surrender as the fruits of a warrantless search. Defendant's argument is without merit.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "It is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). Nonetheless, this "presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness." *Kentucky v. King*, ––– U.S. –––, 131 S.Ct. 1849, 1856 (2011)

(internal quotation marks omitted). A warrantless entry into an individual's residence is per se unreasonable unless the intrusion falls within one of the carefully defined exceptions to the warrant requirement. *Payton v. New York*, 445 U.S. 573, 586–89 (1980).

The Government and the State argue that a warrant was not required because J.W. gave written consent for law enforcement officers to enter the house she shared with Defendant to enforce the terms of the EPO. A search conducted pursuant to valid consent is a well-recognized exception to the Fourth Amendment's general warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Consent to a search in the absence of a warrant may be given by a person other than the target of the search when the third party has authority to consent to the search and the third party's consent is voluntary. *Trulock v. Freeh*, 275 F.3d 391, 402–03 (4th Cir. 2001). Authority to consent does not rest on property interests, but instead on "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). Third party consent is valid as against an absent, non-consenting defendant with whom that authority is shared, *Matlock*, 415 U.S. at 170, but not as against a defendant who is physically present and refuses to consent, *Georgia v. Randolph*, 547 U.S. 103, 120 (2006).

Here, there is no real dispute that J.W. had authority to provide consent or that her consent was voluntary. Defendant argues in the memorandum in support of his motion to suppress that J.W. had no right to consent to the opening of the safe. (ECF 30 at 7.) However, at the motion hearing, Defendant, when asked by his attorney whether anyone else had access to the combination to the safe where the firearms were located, testified: "Yes, sir. [J.W.], my live-

8

in mate, she had the combination to my safe. Her jewelry was in there. You know, she had full access, the same as I did." (ECF 41 at 40.) Defendant also argues that J.W. did not consent to a search of the bedroom closet specifically. (ECF 30 at 7.) The scope of consent is evaluated under an "objective reasonableness" standard. *Florida v. Jimeno*, 500 U.S. 248, 249 (1991); *United States v. Jones*, 356 F.3d 529, 533 (4th Cir. 2004). J.W.'s consent to search the house imposed no limits on the items or areas subject to the consent search, and it extended implicitly to the areas of the house which the officers would reasonably believe it necessary to enter to enforce the terms of the EPO. When they learned that Defendant's firearms were in the bedroom closet, it was objectively reasonable for the officers to believe they had J.W.'s consent to enter the bedroom closet to enforce the order's requirement that Defendant surrender any and all firearms.[2] Defendant, who was present at the scene, did not object to the officers' accessing the safe and indeed took the officers to the safe and opened it for them.[3]

Accordingly, the Court **FINDS** that there was no Fourth Amendment violation, because the officers' entry into Defendant's home and the seizure of his weapons was pursuant to a valid consent.

The Government and the State argued in the alternative that the "good faith exception" articulated in *United States v. Leon*, 468 U.S. 897 (1984) applies in this case. In light of the Court's finding that a warrant was not required in this case, the Court need not address this argument.

---

[2] *Cf. Jones*, 356 F.3d at 534 ("[W]hen a suspect gives his general and unqualified consent for an officer to search a particular area, the officer does not need to return to ask for fresh consent to search a closed container located within that area.").

[3] Although Defendant was under the impression that he had no other choice but to help the officers open the safe, the salient fact in this context, in which the officers had valid third party consent, is that Defendant did not object.

As noted previously, Defendant also argued that West Virginia law violates the Fourth Amendment to the extent that it authorizes the warrantless seizure of firearms pursuant to an emergency domestic violence protective order. (ECF 50 at 7.) Some courts that have had occasion to consider this question in the context of other states' domestic violence protection statutes have found that the seizure of a weapon pursuant to an order of protection is subject to the limits of existing Fourth Amendment jurisprudence. *See State v. Harris*, 50 A.3d 15 (Pa. 2012) (finding gun admissible under plain view exception); *State v. Perkins*, 817 A.2d 364 (N.J. 2003) (finding guns inadmissible because plain view exception did not apply); *Pennsylvania v. Wright*, 742 A.2d 661 (Pa. 1999) (finding guns inadmissible because exigent circumstances and search incident to arrest exceptions did not apply). However, the State argues, correctly, that the Court should avoid ruling on a constitutional question if the matter can be resolved on some other ground. The Supreme Court has announced a "policy of avoiding unnecessary adjudication of constitutional issues," *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 478 (1995) (citing *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346–347 (1936) (Brandeis, J., concurring)). *See also Pearson v. Callahan*, 555 U.S. 223, 241 (2009) (stating that constitutional avoidance is the "general rule"). Having determined that the execution of the EPO by law enforcement officers did not violate the Fourth Amendment in this case, the Court declines the invitation to pass on the question of whether the EPO as written might invite a violation of the Fourth Amendment in cases not before this Court.

*B. Fifth Amendment* Miranda *Rights*

Defendant argues that the Fifth Amendment was violated, as no *Miranda* warning was given to Defendant before he made a potentially incriminating statement. (ECF 30 at 7.) The

only potentially incriminating statement adduced in the parties' submissions and at the motions hearing was the alleged statement that possibly all of Defendant's guns were illegal.

*Miranda* warnings are required when a suspect in custody is subjected to interrogation. *Miranda v. Arizona*, 384 U.S. 436 (1966). The test for determining whether an individual is "in custody" for *Miranda* purposes is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal quotation marks omitted). However, the Court not need to determine whether Defendant was in custody to decide this case.

The *Miranda* rule does not apply to statements volunteered by a defendant who, although in custody, is not subject to the compelling influence of interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Interrogation includes not only express questioning but also its "functional equivalent," namely, any conduct "that the police should know [is] reasonably likely to elicit an incriminating response." *Id. at* 300–01.[4]

The Government argues, correctly, that Corporal Foster's statements were not intended to elicit an incriminating response. While Corporal Foster's and Defendant's testimonies varied as to the minute particulars, it is largely undisputed that Corporal Foster told Defendant that the shotgun appeared to be short and might be illegal, but that it would have to be measured to determine whether it was illegal.[5] Defendant allegedly responded, "Maybe most of the guns I

---

[4] *See also United States v. Johnson*, 734 F.3d 270, 276 (4th Cir. 2013) ("The suspect's subjective experience of the questioning is relevant only to the extent that it should have been anticipated by the officers such that they should have known that the suspect was reasonably likely to incriminate himself in response.").

[5] On this point, Corporal Foster testified as follows: "I believe I looked at him and I said, 'This appears to be a little bit short. This may cause you some problems. This may be illegal.'" (ECF 41 at 13.) He later renewed his recollection as follows: "When I saw the barrel length on it, I want [sic] exactly sure of the federal charge on it or the federal requirements for it, but I said, 'This looks a little bit short. This may be illegal.'" (*Id*. at 24.) According to Defendant, "[Corporal Foster] said 'We'll just have to–that will have to be measured to see if it's legal.' He didn't say it was illegal. Maybe he forgot, you know, but that was his words. He said, 'That will have to be measured,' you know." (*Id.* at 38.) Defendant later recounted that Corporal Foster's words were as follows: "What he said was, 'We'd have to measure that gun.'" (*Id.* at 48; *see also id.* at 50.)

11

have are illegal." (ECF 41 at 13; *see also id.* at 24.) The exchange happened while Defendant was standing just outside the closet containing the safe, Corporal Foster was standing just inside the closet (*id.* at 24–25), and Corporal Foster was in the course of receiving the guns Defendant was surrendering (*id.* at 12). The offhand observation was one that neither invited nor required a response. Corporal Foster's indication that the officers would proceed to seek an objective measurement to determine whether the firearm was in fact illegal was not reasonably likely to elicit an incriminating response.[6]

Accordingly, the Court **FINDS** that *Miranda* does not prohibit the introduction of the statement and that its warnings were not necessary.

*C. Fifth Amendment Privilege Against Compulsory Self-Incrimination*

Finally, Defendant argues that the requirement that he surrender his firearms pursuant to the EPO compelled him to incriminate himself in violation of the Fifth Amendment, because the Government now seeks to introduce the firearms as evidence in a criminal proceeding. (ECF 37 at 2; ECF 41 at 52.)

Defendant relies primarily on *United States v. Boyd*, 116 U.S. 616 (1886), in which the Supreme Court first held that the Fifth Amendment privilege prevents compelled production of documents over objections that such documents might incriminate. *Boyd* has been the subject of much subsequent narrowing. *See, e.g., Fisher v. United States*, 425 U.S. 391, 407–08 (1976) (noting that "[s]everal of *Boyd*'s express or implicit declarations have not stood the test of time" and that "the precise claim sustained in *Boyd* would now be rejected"); Aaron M. Clemens, *The Pending Reinvigoration of* Boyd*: Personal Papers are Protected by the Privilege Against Self-Incrimination*, 25 N. ILL. U. L. REV. 75, 81 (2004) ("*Boyd* is the beginning of any analysis of the

---

[6] *Cf. United States v. Payne*, 954 F.2d 199, 202 (4th Cir. 1992) ("[M]ere declaratory descriptions of incriminating evidence do not invariably constitute interrogation for Miranda purposes.").

12

Fifth Amendment privilege . . . rather than its end."). Nevertheless, Defendant's memorandum in support of his motion to suppress argues summarily that "the continued vitality of the right which a person has not to be compelled to testify against himself or by other means required to provide the government with evidence against himself cannot be questioned." (ECF 30 at 7.) Defendant's reply to the Government's response also argues strenuously for the proposition that domestic violence proceedings are not civil in nature, but rather criminal or quasi-criminal. (ECF 37 at 2–5.) The latter argument is a red herring, and both that argument and the broad reliance on *Boyd* suggest a misunderstanding of the applicable Fifth Amendment law.

The Self-Incrimination Clause of the Fifth Amendment provides that "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V, cl. 3. To receive Fifth Amendment protection, a person's statement or act must (1) be compelled; (2) be testimonial; and (3) incriminate the person in a criminal proceeding. *See United States v. Hubbell*, 530 U.S. 27, 34–37 (2000). *See also Doe v. United States*, 487 U.S. 201, 207 (1988). The protection "not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also privileges him not to answer official questions put to him in any other proceeding, *civil or criminal*, formal or informal, where the answers might incriminate him in future criminal proceedings." *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (internal quotation marks omitted) (emphasis added).

The guns Defendant seeks to suppress are not protected, because they are not testimonial in nature. The Fifth Amendment privilege "does not independently proscribe the compelled production of every sort of incriminating evidence"; it protects a person only against being incriminated by a compelled "testimonial communication." *Fisher v. United States*, 425 U.S. 391, 408 (1976). To be testimonial, a communication "must itself, explicitly or implicitly, relate

13

a factual assertion or disclose information" that expresses "the contents of an individual's mind." *Doe*, 487 U.S. at 210 n.9. On the other hand, "compulsion which makes a suspect or accused the source of real or physical evidence generally does not violate the Fifth Amendment." *United States v. Sweets*, 526 F.3d 122, 127 (4th Cir. 2007) (internal quotations marks omitted). Defendant's guns are mere physical evidence that neither explicitly nor implicitly reveal any contents of Defendant's mind.

Defendant's motion expressly seeks to suppress only the guns themselves. (ECF 26 at 1.) Nevertheless, some of Defendant's subsequent statements at the motions hearing and in the memoranda in support of the motion to suppress might be construed broadly as also challenging Defendant's act of producing the guns from the safe in his house. The Fifth Amendment privilege does not apply only to compelled statements but also "applies to acts that imply assertions of fact.'" *Doe*, 487 U.S. at 209. *See also United States v. Doe,* 465 U.S. 605, 612–14 (1984) (act of production protected by Fifth Amendment where it admitted existence, defendant's control, and authenticity of documents). The introduction of evidence that Defendant lead the officers to his safe and unlocked it for them so that they could remove the guns from within it could arguably be construed as implicitly admitting possession of the guns-one of the elements the Government would be required to prove as to both counts under which Defendant is charged. However, this issue has not been squarely addressed in the parties' briefs, and the Court need not determine whether Defendant's act of producing the guns was testimonial in nature, because Defendant's act was not compelled within the meaning of the Fifth Amendment.

As a general matter, "the privilege against self-incrimination is not self-executing." *Murphy*, 465 U.S. at 427. Testimonial evidence is "not compelled within the meaning of the

Fifth Amendment unless the witness is required to answer over his valid claim of the privilege." *Id.* The Fourth Circuit explained in *United States v. Duncan*, 331 Fed. Appx. 270, 272 (4th Cir. 2009) (unpublished opinion) that

> "[I]n the ordinary case, if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself." *Minnesota v. Murphy*, 465 U.S. 420, 427, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (internal quotation and citation omitted). "[A]n individual may lose the benefit of the privilege without making a knowing and intelligent waiver." *Id.* at 428, 104 S.Ct. 1136 (internal quotation and citation omitted). Under a well-known exception, courts must exclude "incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it." *Id.* at 430, 104 S.Ct. 1136 (citing *Miranda v. Arizona*, 384 U.S. 436, 467–69, 475–77, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). The privilege also need not be claimed when the government seeks to induce a person, either expressly or by implication, "to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions capable of forcing the self-incrimination which the Amendment forbids." *Murphy*, 465 U.S. at 434, 104 S.Ct. 1136 (internal quotation and citation omitted). The person must have been "deterred from claiming the privilege by a reasonably perceived threat of [sanctions]." *Id.* at 439, 104 S.Ct. 1136.

Defendant failed to assert his Fifth Amendment privilege regarding the act of producing the incriminating guns. Defendant cannot claim the Fifth Amendment privilege now. While he may well have faced a contempt proceeding or other sanction in state court for simply refusing to comply with the order, there is no evidence that he would have faced any penalty for asserting the privilege and no evidence that any such penalty was threatened. Therefore, Defendant's Fifth Amendment argument, to the extent that he argues that his compelled act of producing the firearms offended the privilege, fails because of his failure to assert the privilege at the time of production.

Finally, this case is indistinguishable from *Duncan*, in which the Fourth Circuit held, on a review for plain error, that the Fifth Amendment was not violated when a defendant turned over

a firearm to law enforcement pursuant to a domestic violence protection order and was subsequently prosecuted for being a felon in possession of a firearm. *See id*.

Accordingly, the Court **FINDS** no Fifth Amendment violation.

### III. CONCLUSION

For these reasons, Defendant's motion to suppress [ECF 26] is **DENIED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, and the United States Probation Office.

ENTER: December 12, 2014

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE